```
1  BENJAMIN B. WAGNER
   United States Attorney
2  JEREMY R. JEHANGIRI
   Assistant United States Attorney
3  United States Courthouse
   2500 Tulare Street, Suite 4401
4  Fresno, California 93721
   Telephone: (559) 497-4000
5  Facsimile: (559) 497-4099
```

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | 1:10-cr-00498-LJO |
| Plaintiff, ) | SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA & RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM |
| v. ) | |
| LONNY RAY HAYCOCK, ) | Date: April 23, 2012 |
| Defendant. ) | Time: 8:30 a.m. Courtroom Four Honorable Lawrence J. O'Neill |

## I. INTRODUCTION

The United States of America, by and through Assistant United States Attorney Jeremy R. Jehangiri, files this sentencing memorandum to aid the Court in fashioning a sentence.

On January 13, 2012, Defendant Lonny Ray Haycock pleaded guilty to one count of Sexual Exploitation of a Minor, in violation of 18 U.S.C. § 2251(a) and (e). The sentencing of Defendant is set for April 23, 2012. The United States Probation Office, in its Pre-Sentence Investigation Report ("PSR"), recommends a sentence of 292 months of imprisonment and a term of supervised release of 240 months. While the United States has no objections to the PSR, pursuant to the terms of the plea agreement filed on January 12,

1

2012, the United States recommends a sentence of imprisonment of 262 months and a lifetime term of supervised release.

## II. FACTUAL BACKGROUND

Defendant, age 31, has been a resident of Bakersfield. On November 12, 2010, an undercover FBI agent in Philadelphia, Pennsylvania, encountered him sharing files of child pornography on Gigatribe, an advanced file-sharing program that uses encryption and offers more protections for child pornography traffickers (e.g. users can select their friends and restrict who has access to particular files). The agent browsed and downloaded approximately 90 files that he later confirmed to be child pornography. The undercover agent noticed a folder entitled "nevr seen b4," which contained 87 images of recently-produced images of minors in sexually explicit conduct. The agent downloaded 9 of those images. All of the agent's activity is recorded on video software. The undercover agent determined that the files were being shared from an Internet Protocol ("IP") address traced to Bakersfield, California. The person sharing the files in the "nevr seen b4" folder, later determined to be Defendant, maintained that he had additional files available but would only share them with persons making similar material available to him. The producer had embedded the name "connor_davis" and copyright symbols into the images.

The undercover agent contacted an FBI agent in Sacramento, California. The special agent in California was able to use a different undercover account and see the same folder "nevr seen b4" folder on November 28, 2010. The Sacramento agent engaged in a brief online chat with Defendant, who stated that he had access to

the three boys depicted in the sexually explicit images in the "nevr seen b4" folder. Defendant also claimed to be under age 18 but did not want to divulge many personal details that would identify himself. The agent captured the same IP address as the agent from Philadelphia. The Sacramento agent transferred approximately 50 images of child pornography from the suspect in Bakersfield, and he also transferred two images from the "nevr seen b4" folder.

A search warrant was obtained for the residence associated with the IP address in Bakersfield. It was executed on December 3, 2010. During this search, agents realized that the residents at that location were not responsible for the child pornography, but that someone had stolen their unsecured wireless internet connection. Agents were able to rule out all locations except for Defendant's residence. They obtained consent to search Defendant's computer, bedroom, and vehicle. The agents learned that Defendant was the "godparent" of 4 boys aged approximately 6-12. They would routinely sleep over at Defendant's house on weekends. Defendant was very savvy with technology, and he worked in the Information Technology department for the Delano School District. They noticed numerous security cameras that were monitoring the residence (outside and inside).

During their investigation, agents also found in his truck a backpack with a padlock, which secured multiple hard drives, a USB device, and a digital camera. All items appear to have been wiped of all data. As previously stated, Defendant provided consent to preview a netbook computer in his room. It was connected to a very large external hard drive (which could be padlocked to the

desk/table on which it sat) and protected with fire-resistant material. The external hard drive contained a very large partition that was protected by encryption. He provided his password, but it was not a valid password. A forensic analyst noticed that in the unencrypted area, Defendant had a version of Gigatribe that had been installed but also uninstalled. Agents found multiple hard drives and other storage devices, security cameras, a pinhole camera, and a wireless internet signal booster/antenna at his residence, in his truck, and at his offices. Notably, the wireless internet signal booster and antenna allowed Defendant to tap other signals within a specified range.

Through the investigation of the images obtained from undercover sessions on November 12, 2010, and November 28, 2010, agents were able to confirm the boys depicted in the images from the "never seen b4" folder were Defendant's "godsons." These same boys were also successfully identified.

During the summer of 2010, and more specifically on August 21, 2010, Defendant was with the boys depicted in the images. On the night of approximately August 21, 2010, Defendant produced sexually explicit images of the child-victims and subsequently distributed those images to the undercover agents, among others, while utilizing the alias "connor_davis." While distributing these sexually explicit images to the agents and others, Defendant utilized a stolen signal that derived from a neighbor's house.

**III. SENTENCING FACTORS APPLICABLE TO THIS CASE**

    **A.   Nature and Circumstances of the Offense**

Defendant's criminal conduct and the nature and circumstances of this case are among the most egregious in comparison to other

child exploitation cases. The meticulous thought, technical complexity, and utter depravity of Defendant's actions militate in favor of a sentence of imprisonment at the high end of the guideline range set forth in the plea agreement.

During the first undercover session on November 12, 2012, the undercover agent browsed Defendant's directories, which were open for sharing amongst other child pornographers, to observe that approximately 15,561 files were available for download. The sheer number of files totaled roughly 42 gigabytes. Defendant's directories were viewed again during the second undercover session on November 28. Defendant, all the while, employed an alias to thwart detection. In doing so, Defendant bought a pre-paid credit card, utilized a neighbor's address, and then used his alias, pre-paid credit care, and false address to pay for his Gigatribe account. Despite all of Defendant's affirmative acts to disguise his true identity and foil efforts to find the producer of the child pornography at issue in this case, law enforcement agents were able to locate him as a result of good police work.

Once found, a search commenced. When Defendant's notebook computer was searched, the forensic examiner observed an "A" file that was secured with a 64-bit encryption code. As the forensic examiner noted, this "A" file contained roughly 100 gigabytes of files, although those files were never seen, other than during the undercover sessions, because of the high level of encryption. This level of encryption was virtually impossible to break. The forensic examiner also noticed that Defendant used a virtual computer, which has the ability to make it impossible to trace the actions of the user. Finally, the external hard drive was

surrounded by fireproof materials, then encased in steel, and bolted to Defendant's desk in his bedroom.

As the facts of this case demonstrate, Defendant used his IT knowledge and experience in an extremely nefarious manner. He deceived and, until recently, avoided detection, whether by law enforcement, family and friends, or neighbors. He also safeguarded his treasures – child pornography that he produced and traded – under the guise of an alias and by literally bolting and fireproofing the casing in which it was stored. Nothing would separate Defendant from his work and his prized possessions.

Amongst the images and videos of child pornography on Defendant's system, Defendant also provided samples of the images that he produced. In providing these images for others to use to satisfy their sexual gratification, Defendant's words in the associated text files and statements made to the agent during the undercover session show that Defendant acted cavalier and proud about his criminal actions. To that end, Defendant signed his work, dated it, and then copyrighted it with his alias. Sadly, he also described in vivid detail the bodies of his victims, as though they were objects.

More importantly, these images were of his own "godsons," all of whom, including the mother of these boys, considered Defendant family. Defendant's breach of trust and abuse of power demonstrate how callously he operated in perpetrating these acts of sexual exploitation. For all of the reasons stated herein, and for those set forth in the PSR, the nature and circumstances of Defendant's actions and count of conviction all justify an extremely long period of imprisonment.

**B.   History and Characteristics of Defendant**

While Defendant's school and work history are commendable, the circumstances of this case demonstrate how Defendant utilized his intelligence and work experience to perpetrate the conduct surrounding his count of conviction and the relevant conduct. Although undersigned counsel for the United States typically refrains from commenting on letters of support provided to the Court on behalf of a defendant, it is worth noting in this case what those letters demonstrate: that Defendant has successfully fooled everyone and he continues to do so. The effectiveness of Defendant's manipulative character takes full shape when reading the letters submitted on his behalf.

Until this prosecution, Defendant lived a double life. In one life, he worked for a school district in the IT department and conducted his own contracting business; he was ostensibly a good neighbor; he was a willing godparent and grandson; he was seemingly a good friend. In the other life, though, he took advantage of his experience to steal an internet connection from his neighbor so he could trade child pornography; he used a fake name, a pre-paid credit card, and another neighbor's address to register and pay for his paid version of Gigatribe, through which he traded his collection of child pornography; he deceived a friend of 15 years to groom and perpetrate heinous crimes against that friend's young children; he bragged about his access to the victims to others with whom he had no relationship other than on-line.

This history and these characteristics provide a clear showing of Defendant's true, evil side. Defendant's power to manipulate,

however, no longer works on the United States nor, more importantly, on the victims of his criminal conduct.

### C. 18 U.S.C. § 3553(a)(2)(A)-(D) Factors & the Need for a Sentence of Imprisonment

A sentence of imprisonment works to protect the public from further crimes by Defendant. As the Supreme Court has stated, "the risk of recidivism posed by sex offenders is frightening and high." *See Smith v. Doe,* 538 U.S. 84, 103 (2003) (citation and internal quotation omitted). A sentence of imprisonment is vital to the protection of society in light of the fact that "[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault." *See McKune v. Lile,* 536 U.S. 24, 33 (2002). In stark contradiction to recidivism findings among sexual offenders, Defendant does not view himself as a risk to society. *See* U.S. Dept. of Justice, Bureau of Justice Statistics, Recidivism of Prisoners Released in 1983 (1997). Contrary to his assertions, because of the seriousness of the offense and relevant conduct, and for the aforementioned reasons, the sentence imposed must be significant. While there are mitigating facts in this case, those same facts are likewise aggravating in that Defendant manipulated those who trusted him in order to utilize his training and education to produce, receive, and distribute child pornography. Thus, the factors set forth in 18 U.S.C. § 3553(a)(2) justify a sentence of 262 months of imprisonment.

**IV. RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM**

Defendant's sentencing memorandum raises two issues of concern. First, it appears that, although expressly precluded in the plea agreement, Defendant requests the Court to downward

depart, downward vary, or both. The United States deems these requests as a breach of the plea agreement.

Second, Defendant makes much of the fact that the United States did not file a response to Defendant's informal and formal objections. The United States has no obligation, in light of the subject matter raised in the legal objections, to file a response to Defendant's filings. Moreover, the United States joins the Probation Office's conclusion that a sentence of 210 months would be inappropriate under the Guidelines and 3553(a) factors. As aptly noted in the United States Probation Office's response, the Court is not bound by the parties' plea agreement, and it is free to sentence Defendant to any sentence it deems appropriate under the United States Sentencing Guidelines and sentencing statutes. As such, regardless of the parties agreement and prospective guideline calculation, the Court is free to impose a sentence as high as 30 years (360 months) of imprisonment.

**IV. SENTENCES IN OTHER JURISDICTIONS**

Child sex crimes are among the most egregious and despicable of societal and criminal offenses, and courts all over the United States have upheld lengthy sentences in these cases as substantively reasonable. Below are just some examples of sentences that have been imposed and upheld in cases that involved less egregious facts than in this case.

- United States v. Betcher, 534 F.3d 820, 827-28 (8th Cir. 2008) (upholding as reasonable a 750-year sentence for a first-time offender who had taken pornographic pictures of five 8 to 11 year-old girls, including two of his granddaughters);
- United States v. Johnson, 451 F.3d 1239, 1244 (11th Cir.2006) (upholding as reasonable a 140-year sentence for abusing and photographing three boys between the ages of 8 and 16 based on consecutive statutory maximums under 18 U.S.C. § 2251(e) and § 2252A(b)(1);

9

- United States v. Vowell, 516 F.3d 503, 511-13 (6th Cir. 2008) (upholding as reasonable a 780-month sentence for a 40-year-old man who had sexual intercourse with his girlfriend's 8-year-old daughter while being videotaped by his girlfriend);
- United States v. Paton, 535 F.3d 829, 837-38 (8th Cir. 2008) (concluding that life sentence for five counts of production of child pornography was not cruel and unusual punishment in violation of the Eighth Amendment);
- United States v. Sarras, 571 F.3d 111 (11th Cir. 2009) (upholding a sentence of 1200 months as reasonable in case involving convictions for three counts of child sexual exploitation for production of sexually explicit images by defendant of his thirteen year-old step-daughter and one count of possession of child pornography);
- United States v. Kapordelis, 2009 WL 1508342, at *19-20 (upholding as reasonable a 420-month sentence, which represented an upward variance from the 262-327-month advisory guidelines range and included 240-month sentences on counts charging production of child pornography under § 2251(a) and 180-month consecutive sentences on counts charging receipt of child pornography under § 2252(A)(a)(2)(A));
- United States v. Huffstatler, 561 F.3d 694, 698 (7th Cir. 2009) (upholding as reasonable an above-guidelines, 450-month sentence for producing pornographic pictures of a 14-year-old boy);
- United States v. Raplinger, 555 F.3d 687, 695 (8th Cir. 2009) (upholding as reasonable a 457-month sentence for photographing and having sexual intercourse with a 15-year-old girl);
- United States v. Herbst, 2009 WL 4884250 (unpublished) (9th Cir. 2009) (upholding as reasonable sentence of 70 years for multiple counts of production of child pornography).

This list is a mere sample of cases from other jurisdictions, but it provides additional context for the sentencing of these types of cases and further justifies the United States' sentencing recommendation.

**V. CONCERNS OF CONGRESS & UNITED STATES SUPREME COURT**

There is a continued focus on people who sexually exploit children, such as Defendant, and this focus demonstrates that Congress has not lost sight of the child pornography scourge and believes that continued legislation, to ensure effective prosecution and punishment, has been needed. This recent legislative activity is consistent with Congress' attempt to "restore the government's ability to prosecute child pornography

10

offenses successfully," United States v. MacEwan, 445 F.3d 249, n.12 (2006) (quoting S. Rep. No. 108-2, at 1 (2003)), by "ensuring that the criminal prohibitions against child pornography remain enforceable and effective," PROTECT Act, Pub. L. No. 108-21, § 501, 117 Stat. 650, 676 (2003), codified at 18 U.S.C. § 2251 note.

As the United States Supreme Court recently explained, "[c]hild pornography harms and debases the most defenseless of our citizens. Both the State and Federal Governments have sought to suppress it for many years, only to find it proliferating through the new medium of the Internet." United States v. Williams, 553 U.S. 285, 307 (2008). Congress, too, has explained the difficulties in successfully combating the "immense" problem of child pornography and the "rapidly-growing market" for such materials, which is fueled by new technologies that were largely unavailable when the Guidelines were first promulgated. See S. Rep. No. 108-2. Indeed, despite the "pernicious evil" of the crime, Congress has repeatedly expressed its dismay about the "excessive leniency" of federal sentences, see H. Rep. No. 108-66, and S. Rep. No. 104-358, especially in light of the "continuing harm" caused to the children appearing in such materials, as well as the inflammatory effect it has on the "desires of child molesters, pedophiles, and child pornographers," which results in a robust and growing market for child pornography and therefore increased abuse of innocent children, see Child Pornography Prevention Act of 1996, Pub. L. No. 104-208, § 121, 110 Stat. 3009, 3009-26, 27 (1996), codified at 18 U.S.C. § 2251 note; MacEwan, 445 F.3d at 250; United States v. Norris, 159 F.3d 926, 929 (5th Cir.

1998) ("[T]he 'victimization' of the children involved does not end when the pornographer's camera is put away.").

Congress has found that child pornography "is a form of sexual abuse which can result in physical or psychological harm, or both, to the children involved." Child Pornography Prevention Act of 1996, 1 Pub.L. No. 104-208, § 121, 110 Stat. 3009 (1996) (codified as amended at 18 U.S.C. § 2251). Congress found that "where children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years." Id. Moreover, Congress found little distinction in the harm caused by a pedophile, be he a distributor or mere consumer in child pornography, because the mere "existence of and traffic in child pornographic images creates the potential for many types of harm in the community and presents a clear and present danger to all children." Id. at 3009-27. Furthermore, "it inflames the desires of ... pedophiles ... who prey on children, thereby increasing the creation and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials." Id.; see also New York v. Ferber, 458 U.S. 747, 757 (1982).

All of this goes to support a lengthy term of imprisonment, because the court must consider the factors outlined at 18 U.S.C. § 3553(a). Subsections (3) and (4) provide that a court "shall consider . . . the kinds of sentences available" and "the sentencing range established for (A) the applicable category of offense committed by the applicable category of defendant, as set

forth in the guidelines. Subsection (5) requires a court to consider "any pertinent policy statement" issued by the Sentencing Commission." Based on the authority above, and under the circumstances of this case, these factors all weigh in favor of a sentence at the high end of the advisory guideline range of 37.

## VI. CONCLUSION

Defendant abused the trust given to him by loved ones to perpetrate crimes that will live in perpetuity. The child pornography *produced and traded by Defendant* will forever be floating around on the world-wide-web for others like him to exploit. He used and stole from his neighbors. He successfully lived two lives and manipulated everyone around him to groom and sexually exploit the innocent victims in this case. Accordingly, as maintained throughout this memorandum, a sentence of imprisonment at the high end of the contemplated range is suited for this case.

Dated this 18th day of April, 2012.

                                          Respectfully submitted,

                                          BENJAMIN B. WAGNER
                                          United States Attorney

                              By: */s/ Jeremy Jehangiri*
                                          JEREMY R. JEHANGIRI
                                          Assistant United States Attorney